# 12 3947PWG — 12 3957PWG

FILED
LODGED
RECEIVED

SEP 2 7 2012

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Brian M. Stine being duly sworn, depose and state as follows:

1.  I, Brian Stine, am employed as a Special Agent (SA) by the Drug Enforcement Administration (DEA), and have been since July 1996.  I am assigned to the Washington Field Division, Baltimore District Office, investigating cases primarily within the District of Maryland. Prior to becoming a special agent, I was employed as a Detective First Class with the St. Mary's County Sheriff Office, St. Mary's County, Maryland, for approximately five years.  I obtained my Bachelor's degree in Behavior Social Science and Criminal Justice at University of Maryland in 1991 and received my Master's Degree from the Marine Corps University in 2007.  I am responsible for enforcing federal violations of the Controlled Substances Act, Title 21 of the United States Code.   I have received specialized training and participated in investigations relating to the possession, manufacture, distribution, importation of illegal drugs, as well as methods used to conceal and finance illegal drug transactions and drug diversion.

2.  I am submitting this affidavit in support of a search warrant authorizing a search of the following electronic devices, previously seized pursuant to a warrant authorized by the Honorable United States Magistrate Judge Paul W. Grimm:

Seven (7) DELL COMPUTER HARD DRIVES:

    a.  Dell Hard Drive Tag #9NQ68P1

    b.  Dell Hard Drive Tag #4V04MN1

    c.  Dell Hard Drive Tag #16H2PM1

    d.  Dell Hard Drive Tag #5Q60LM1

    e.  Dell Hard Drive Tag #1MC4PM1

    f.  Dell Hard Drive Tag #3CR12511CX

    g.  Dell Hard Drive Tag #5KP5MN1

One (1) ~~AUSA~~ *Asus* LAPTOP COMPUTER Serial #ABN0AS656926499

Two (2) APPLE I PHONES:
   a.   Apple I Phone #A1387
   b.   Apple I Phone #EL55301

One (1) NOKIA PHONE # (1C#661U-RM-639)

We are requesting authorization to search the items specified in Attachment B, which may contain evidence of violations of federal law, including drug trafficking and related activities in violation of Title 21, United States Code, Sections 841(a)(1) and 846. We are requesting authority to search the internal computer hard drives and any and all electronic media storage devices within the computers and cellular telephones; and therein for the items specified in Attachment A, and to seize all items listed in Attachment A as possible instrumentalities, fruits and evidence of crime. The electronic media will be searched pursuant to the protocol in Attachment C.

3.      The facts and information contained in this affidavit are based upon our personal knowledge of the investigation, observations of other officers and agents involved in this investigation, and intelligence gathered from non-law enforcement sources. All observations referenced below that were not made by us personally, were related to us by the persons who made such observations. This affidavit contains information deemed necessary to support probable cause for a search warrant. It is not intended to include each and every fact and matter observed by us or known to the government. Furthermore, this affidavit incorporates by reference the May 15. 2012 affidavit supporting the search of the Healthy Life Medical Group clinic, attached as Attachment D.

## STATUTORY AUTHORITY

4.      The Controlled Substances Act (CSA), 21 U.S.C. §§ 801 *et. seq.* "creates a comprehensive regulatory regime criminalizing the unauthorized manufacture, distribution,

Page **2** of **6**

4426

dispensing and possession of substances classified in any of the Act's five schedules." <u>Gonzalez v. Oregon</u>, 546 U.S. 243, 250 (2006). Section 841(a) (1) makes it unlawful, except under circumstances authorized by statute, "for any person knowingly or intentionally... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 846 makes it unlawful for any person to "attempt or conspire" to violate the CSA.

5. One exception authorized by the CSA is that registered practitioners are allowed to issue prescriptions for controlled substances classified in four of the five schedules. See 21 U.S.C. § 829. These prescriptions must "be issued for a legitimate purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. 1306.04(a). A doctor who fails to act for a legitimate medical purpose in issuing prescriptions may be criminally charged for unlawful distribution under the CSA. <u>United States v. Moore</u>, 423 U.S. 122, 124 (1975).

## THE INVESTIGATION

6. On or about April 2011, the DEA Baltimore District Office's (BDO) Tactical Diversion Squad (TDS) and the Baltimore County Police Department initiated a criminal investigation into the activities of the HEALTHY LIFE MEDICAL GROUP (HLMG) Pain Clinic, located at 9607 Reisterstown, Maryland, and 1134 York Road, Lutherville, Maryland. The owners/operators of HLMG were identified as Alina MARGULIS, Michael RESNICK aka REZNIKOV, Gerald WISEBERG, and KAHI BLIADZE. Investigators believed that HLMG was illegally overprescribing prescription medicine, including oxycodone and aplrazolam (Xanax).

7. During the course of the investigation, numerous operational techniques were utilized for the purposes of identifying the criminal activities occurring within HLMG, including the use of undercover agents, various means of surveillance, the use of confidential sources, interviews with individuals working in HLMG, interviews with individuals who were patients of HLMG, and the use of a pole camera. As more fully explained in the affidavit attached in Attachment D,

this investigation revealed that the owners/managers of the HLMG pain clinic and the doctors working there were, indeed, drastically overprescribing medicine to their patients.

8.    On May 15, 2012, agents and officers from DEA and the Baltimore County Police Department executed a Federal Search and Seizure Warrant at HLMG, located at 1134 York Road, Lutherville, Maryland. In connection with the warrant, 77 boxes of documents and patient files were seized. In addition, the following electronic media devices were seized:

a.  An ~~AUSA~~ *Asus* Laptop Computer #ABN0AS656926499

b.  Two Apple iPhones:
    1.  Apple iPhone #A1387
    2.  Apple iPhone #EL55301

c.  A Nokia cellular telephone # 1C#661U-RM-639

d.  Seven Dell Computer Network Hard Drives:
    1.    Dell Hard Drive Tag #9NQ68P1
    2.    Dell Hard Drive Tag #4V04MN1
    3.    Dell Hard Drive Tag #16H2PM1
    4.    Dell Hard Drive Tag #5Q60LM1
    5.    Dell Hard Drive Tag #1MC4PM1
    6.    Dell Hard Drive Tag #3CR12511CX
    7.    Dell Hard Drive Tag #5KP5MN1

These items were seized and placed into the non-drug evidence vault for the purposes of safeguarding/maintaining the items, until a search warrant could be obtained for the information contained within the devices, which will be examined by forensic computer experts when a warrant has been obtained for same.

9.     During the execution of the warrant, several members of the HLMG staff were interviewed, including RESNICK and WISEBERG.   Staff members stated that the Dell computers were an essential part of documenting patient activities within the practice, as well as the day to day activities within the office. The Dell computers were located throughout the main office area of the clinic and were utilized by all members of the staff, including the clerical staff, medical staff, and RESNICK, MARGULIS, WISBERG, AND BLIADZE. The office manager, Kahi BLIADZE, stated to investigators that the Dell computers were used to document patient appointments, patient records, medical requests (both inside and outside the practice), and clinical notes. He stated that the computers contain medical records, financial records, personnel records, patient appointments, and staff schedules.  BLIADZE identified the Dell computers as being the main informational electronic media storage devices for the HLMG clinic.

10.     When the office of Michael RESNICK was searched, an AUSA LAPTOP COMPUTER Serial #ABN0AS656926499 was seized from his desk. During the interview of RESNICK, RESNICK stated that the computer was owned by him, and he stated that the computer was used for business and personal use. RESNICK stated that he used the laptop to send and receive emails, write letters, document incidents that occurred within the clinic, and manage his schedule. He also stated that he maintained various telephone numbers, email address, and contact information for business and personal use.

11.     In addition to the laptop computer, agents seized an Apple iPhone (#EL55301) and a NOKIA cellular telephone Serial# (1C#661U-RM-639) from the person of Michael RESNICK. When asked by agents, RESNICK stated that the two cellular telephones belonged to him, and that he used them both for business and pleasure.  RESNICK stated that he maintained various telephone and contact information within the two phones. He further stated that he used the Apple iPhone for sending and receiving emails.

12.     Agents seized an Apple iPhone (#A1387) from the person of Kahi BLIADZE, who was identified as the office manager for HLMG.   BLIADZE stated that he used his phone for business and pleasure. He also stated that he sent and received email to other members of the

12 3947PWG-12 3957PWG

HLMG management staff, including RESNICK and MARGULIS. He also stored other people's telephone numbers and contact information within his phone. BLIADZE stated that whenever he had a problem arise at the clinic that he could not handle, he would call or email RESNICK or MARGULIS.

## CONCLUSION

13. Based on the aforementioned factual information, we respectfully submit that there is probable cause to believe that Alina MARGULIS, Michael RESNICK aka REZNIKOV, Gerald WISEBERG, Kahi BLIADZE, and any other owners, other doctors, and employees of HEALTHY LIFE MEDICAL GROUP, Inc. have utilized the above-cited computers, cellular telephones, smart phones, and media storage devices for the purposes of storing data, which was created, utilized, or maintained in conjunction with criminal acts, that are in violation of federal law, including drug trafficking and related activities in violation of Title 21, United States Code, Sections 841(a)(l) and 846. It is the belief of the investigators and Affiant that the information stored within the above-cited devices are, in fact, evidence of criminal activity. It is also believed that the discovery of any additional patient records, clinical notes, and enteral documents or memorandums stored with in devices will further reveal the continuing course of criminal conduct by the doctors and owners of HLMG. Additionally, there is probable cause to believe that evidence of the commission of these offenses are located within the above-cited electronic devices, in Attachment A, and that this evidence, listed in Attachment B, and which is incorporated by reference, is evidence, contraband, the fruits of crime, things otherwise criminally possessed or property which is or has been used as a means of committing the foregoing offenses.

Brian M. Stine., SPECIAL AGENT
Drug Enforcement Administration

Subscribed and sworn to before me

This ___16th___ day of ___August_____, 2012.
UNITED STATES MAGISTRATE JUDGE

Page **6** of **6**

**ATTACHMENT A:**

## ITEMS TO BE SEIZED:

1.      Documents and records of the purchase, receipt, inventory, return (credit), transfer, dispensation, sale and shipment of prescription drugs, including controlled substances.

2.      Controlled Substance prescriptions and controlled substance prescription drug orders (whether original, oral, facsimile or otherwise).

3.      Daily drug logs.

4.      Customer/patient charts and information files, including, medical records, laboratory and other diagnostic procedure test results, screening records, consultation forms and any similar documents.

5.      Physician profiles.

6.      Agreements and contracts with all persons and entities for goods and services relating to *for prescription drugs, including Controlled Substances* the establishment and operation of internet websites and records of payments pursuant to such agreements and contacts.

*RW WMW 8/16/12*

7.      Documents and records that relate to internet and/or telephone consultations, authorizations for controlled substance prescriptions, customer consultation forms, physician applications, physician agreements or contracts, facsimile transmittals for prescriptions, and other documents and records that pertain to internet and/or telephone consultations and authorizations for oral and written prescriptions.

8.      Telephone records, telephone messages, address books, telephone recordings, electronic communication devices including telephone paging devices and the telephone numbers stored within, cellular telephones, records of electronic facsimile or "faxed" transmissions, telexes, or other records of communications with others.

9.      All records of documents of domestic and foreign financial institution accounts (such as checking, savings, certificates of deposit, money market, loans, lines of credit, investments, brokerage, credit card, and credit card merchant accounts), including but not limited to periodic statements, deposits, withdrawals, checks, debits, credits, wire transfers, loan applications, loan disbursements and repayment records, official checks, credit card charge documents, and merchant account documents.

10.     Records of acquisition, ownership and disposition of stock, bonds, mutual funds, business interests, and other investment vehicles.

11.     Other business records including but not limited to ledgers, journals, invoices, bills, statements, appointment books, correspondence, notes, financial statements, remittance devices, vehicle and vessel registrations, and travel records.

1

# ATTACHMENT B

1. Seven (7) DELL COMPUTER HARD DRIVES:

   a. Dell Hard Drive Tag #9NQ68P1

   b. Dell Hard Drive Tag #4V04MN1

   c. Dell Hard Drive Tag #16H2PM1

   d. Dell Hard Drive Tag #5Q60LM1

   e. Dell Hard Drive Tag #1MC4PM1

   f. Dell Hard Drive Tag #3CR12511CX

   g. Dell Hard Drive Tag #5KP5MN1

2. One (1) AUSA LAPTOP COMPUTER serial number ABN0AS656926499

3. Two (2) APPLE iPHONES:

   a. Apple iPhone serial number A1387

   b. Apple iPhone serial number EL55301

4. One (1) NOKIA PHONE serial number 1C#661U-RM-639

# ATTACHMENT C:

This warrant authorizes the search of certain electronic devices, listed on Attachment A. Because of the possibility that the electronically stored information in the subject electronic devices on Attachment A may include information that is beyond the scope of the information for which there is probable cause to search, the search shall be conducted in a manner designed to minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search is not viewed. While this protocol does not prescribe the specific search protocol to be used by the Drug Enforcement Administration ("DEA") it does contain limitations to what they may view during their search, and the agents shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted pursuant to the following protocol:

With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment A hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that investigators conducting the search will view information that is beyond the scope for which probable cause exists. The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:

1.    Use of computer search methodology to conduct an examination of the electronically stored information contained in the subject electronic devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;

2.    Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

3.    Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein.

12 3947PWG-12 3957PWG

# ATTACHMENT D

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

We, Brian M. Stine and Douglas Kriete, being duly sworn, depose and state as follows:

1.      I, Brian Stine, am employed as a Special Agent (SA) by the Drug Enforcement
Administration (DEA), and so been since July 1996. I am assigned to the Washington Field
Division, Baltimore District Office, investigating cases primarily within the District of Maryland.
Prior to becoming a special agent, I was employed as a Detective First Class with the St. Mary's
County Sheriff Office, St. Mary's County, Maryland, for approximately five year. I obtained my
Bachelor's degree in Behavior Social Science and Criminal Justice at University of Maryland in
1991 and received my Master's Degree from the Marine Corps University in 2007. I am
responsible for enforcing federal violations of the Controlled Substance Act, more specifically,
Title 21, United States Code. I have received specialized training and participated in
investigations relating to the possession, manufacture, distribution, importation of illegal drugs,
as well as methods used to conceal and finance illegal drug transactions and drug diversion.

I, Detective Douglas P. Kriete, have been a duly sworn member of the Baltimore County
Police Department for over twenty-nine (29) years. During this tenure, your affiant Kriete has
been assigned to the Accident Reconstruction Unit and the Vice/Narcotics Section. From May of
1988 until the present, your affiant Kriete has been assigned to the Vice/Narcotics Section
(specifically Narcotics) of the Criminal Investigation Division of the Baltimore County Police
Department. Your affiant Kriete has made a minimum of one hundred (100) hand to hand
purchases of controlled dangerous substances (CDS) (i.e. Cocaine, Marijuana, Heroin and
Phencyclidine) from known and suspected narcotics violators, while working in an undercover
capacity. Your affiant Kriete has also participated in excess of two hundred (200) controlled
purchases of CDS from known and suspected narcotic violators, which involved the assistance of
informants. During your affiant Kriete's tenure with the Baltimore County Police Department,
he has participated in the writing, preparation, and execution of over two hundred and fifty (250)

search and seizure warrants, which have resulted in the seizure of quantities of controlled dangerous substances (CDS), assorted items of packaging materials, paraphernalia related to the narcotics trade, ledger sheets, customer lists, currency and weapons used in the furtherance of illegal narcotics trafficking. Your affiant Kriete has assisted or made over five hundred (500) arrests for criminal violations dealing with the CDS laws of the State of Maryland, California, New York and Texas.

2.      We are submitting this affidavit in support of an application in support of a search warrant authorizing a search of HEALTHY LIFE MEDICAL GROUP Center, Inc. a medical office, located and operated out of 1134 York Road, Suite 101, Lutherville, Maryland, Baltimore County, District of Maryland 21093, the HILTON HOTEL, located at 1726 Reisterstown Road, Pikesville, Maryland 21208, and a 2012 VOLKSWAGEN JETTA, license plate FSD5006, as is more particularly described in Attachments B1, B2, and B3. We are requesting authorization to search for and seize the items specified in Attachment A, which constitute evidence, fruits and instrumentalities of violations of federal law, including drug trafficking and related activities in violation of Title 21, United States Code, Sections 841(a)(1) and 846. We are further requesting to seize and search computer or computer media located therein where the items specified in Attachment A may be found, and will search that media in accordance with the procedures set forth in Attachment C.

3.      The facts and information contained in this affidavit are based upon our personal knowledge of the investigation, observations of other officers and agents involved in this investigation, and intelligence gathered from non-law enforcement sources. All observations referenced below that were not made by us personally, were related to us by the persons who made such observations. This affidavit contains information deemed necessary to support probable cause for a search warrant. It is not intended to include each and every fact and matter observed by us or known to the government.

**STATUTORY AUTHORITY**

4.      The Controlled Substances Act (CSA), 21 U.S.C. §§ 801 *et. Seq.*, "creates a

comprehensive regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing and possession of substances classified in any of the Act's five schedules." <u>Gonzalez v. Oregon</u>, 546 U.S. 243, 250 (2006). Section 841(a)(1) makes it unlawful, except under circumstances authorized by statute, "for any person knowingly or intentionally... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 846 makes it unlawful for any person to "attempt or conspire" to violate the CSA.

5.      One exception authorized by the CSA is that registered practitioners are allowed to issue prescriptions for controlled substances classified in four of the five schedules. See 21 U.S.C. § 829. These prescriptions must "be issued for a legitimate purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. 1306.04(a). A doctor who fails to act for a legitimate medical purpose in issuing prescriptions may be criminally charged for unlawful distribution under the CSA. <u>United States v. Moore</u>, 423 U.S. 122, 124 (1975).

## TECHNICAL TERMS

6.      As a preliminary matter, the following terms may be discussed in this Affidavit. Based on my training and experience, I use the following terms to convey the following meanings:

a.      "Controlled substances" are a subset of drugs that carry a risk of abuse or misuse. There are five levels, or schedules, of controlled substances. Schedule I drugs, such as heroin, are drugs with no accepted medical use in treatment, and they have the highest level of abuse or misuse. Schedule II drugs, such as Oxycodone, have a recognized medical use but their use is severely restricted in the United States. They also have a high level of abuse or misuse, so their use must be highly supervised. Schedule III and IV drugs have fewer controls than Schedule I or II. However, use of Schedule III and IV drugs must also be properly supervised, particularly when prescribed in a "cocktail" and used in combination with Schedule II drugs. Schedule V drugs have less potential for abuse than Schedule IV drugs.

b.      "Oxycodone" (also known by its brand names, "Roxicodone" and

Page **3** of **20**

12 3947 PWG–12 3957 PWG

"OxyContin") is a strong narcotic pain-reliever similar to morphine, codeine, and Hydrocodone. It is a potent and addictive opioid that is classified as a Schedule II drug under the Controlled Substances Act. See 21 U.S.C. § 812 (2000); 21 C.F.R. § 1308.12(b)(1) (2004). Oxycodone is available mixed with acetaminophen in forms commonly referred to as Percocet and Roxicet. It is also available without acetaminophen or aspirin in stronger forms such as Oxycodone 15mgs and Oxycodone 30mgs. It also comes in a continuous release form known as OxyContin. Street names for Oxycodone include "Oxys," "Roxis," "thirties" or "blues" (referring to 30mg pills), and "fifteens" or "greens" (referring to 15mg pills).

c.  "Xanax" or its generic equivalent "Alprazolam" is a benzodiazepine, which is often used to treat anxiety disorders or insomnia. It is classified as a Schedule IV drug under the Controlled Substances Act. Xanax comes in .25mg, .5mg, 1mg, 2mg, and 3mg tablets.

d.  "Magnetic Resonance Imaging" or "MRI" is a technique that uses a magnetic field and radio waves to create detailed images of the organs and tissues within the body.

## THE INVESTIGATION

7.  On or about April 2011, the DEA Baltimore District Office's (BDO) Tactical Diversion Squad (TDS) was informed by a Confidential Source, hereafter referred to as CS1, that a "Pill Mill" by the name of HEALTHY LIFE MEDICAL GROUP (Healthy Life) had recently opened in the area of Reisterstown Road. CS1 stated that HEALTHY LIFE MEDICAL GROUP was located at 9607 Reisterstown, Maryland; this business is advertised and marketed as a specialized pain management clinic. CS1 advised that the business was operated by Alina MARGULIS and Michael REZNIKOV, who are believed to be husband and wife.

8.  CS1 stated that the pain clinic does not accept insurance, and is a cash business only. The clinic sees about 40 to 80 patients per day. Most patients were charged approximately $350.00 per visit. Once at the business, the patient pays his office visit fee and then is asked to sit and

Alprazolam 2mg with a 30 Count
Doctor:          Dr. Warren Simms
                 Healthy Life Medical Group
Phone:           410-902-4770
DEA:             #MS1390234

13.     The detectives informed the second pharmacist to wait until the police arrived at the pharmacy before dispensing the medication, as they appeared to be fraudulent prescriptions. Shortly thereafter, members of the Baltimore County Police Department arrived at the second Giant Pharmacy, where they located a van with Kentucky tags, containing all three above-cited individuals, and another individual, later developed as CS5. Officers made contact with the subjects and discovered evidence of prescription fraud and doctor shopping within their vehicle, and the individuals were arrested. Also found in the van were documents showing that three of the individuals were getting Oxycodone from doctors in Kentucky, Florida, and Maryland. The following evidence was seized from the vehicle and individuals after their arrest:

**CS 2**
- Rx bottle containing 23-Green pills positively identified as Oxycodone, a Schedule II CDS in the name of CS 2
- Rx bottle containing 117-Blue pills positively identified as Oxycodone, a Schedule II CDS in the name of CS 2.
- Rx bottle containing 40-White pills positively identified as Alprazolam, a Schedule IV CDS in the name of CS 2.
- $1,023.00 in United States currency.

**CS 3**
- Rx bottle containing 90-Green pills positively identified as Oxycodone, a Schedule II CDS in the name of CS 3.
- Rx bottle containing 118-Blue pills positively identified as Oxycodone, a Schedule II CDS in the name of CS 3.
- Rx bottle containing 54-Blue pills positively identified as Alprazolam, a Schedule IV CDS in the name of CS 3.

**CS 4**
- Three Rx prescriptions that were attempted to be passed at the Giant Pharmacy located at 3757 Old Court Road, 21208, which were:
  - 50 Oxycodone 15mg.
  - 120 Oxycodone 30mg.
  - 30 Alprazolam 2mg.

Page 7 of **20**

- $853.00 in United States currency from CS 4's person.
- A white cut straw with residue from the purse of CS 4, which was recovered while at the Franklin Police Station.

### CS 5

- An Rx bottle containing 53 yellow pills positively identified as Endocet, a Schedule II CDS recovered from the person of CS 5.
- An Rx bottle with an obliterated label containing 11-Green pills positively identified as Oxycodone, a Schedule II CDS.
- $4,154.00 in United States currency

14.     All of the subjects provided the officers with post-Miranda statements as to their activities. CS 3 stated that she had been getting her Oxycodone from a Florida clinic, but it closed, so she had to come to the Maryland clinic. CS3 could not provide the name of the doctor that she saw or the name of the medical practice that she just came from. She also stated that she was getting the Oxycodone in other states, because she could not get large quantities of it in Kentucky, due to the Oxycodone crackdown by law enforcement. CS4 gave a statement to the detectives, in which she advised that he/she received the prescriptions based on his/her verbal complaint; at no time during his/her visit with the doctor at HLGM received a hands-on physical exam. Additionally, CS4 stated that the doctor did not even conduct a flexibility exam, which is used to gauge a person's mobility and range of motion, when a back and lower back injury is the chief complaint.

15.     CS 4 told investigators that she resided in Kentucky and she was seeing doctors in Kentucky, Florida, and Maryland in order to get her oxycodone pills. She stated that she was seeing a doctor in Florida, but the clinic had been closed, so he referred her to their Maryland clinic. Again, CS 4 could not provide investigators with the name of the doctor that she just saw or the name of the clinic that she had just left. CS 4 stated that the reason for her going out of state to get her Oxycodone medication was the fact that she could not get large quantities of Oxycodone in Kentucky.

16.     CS 2 advised the investigators that he also lived in Kentucky and he was getting his

12 3947 PWG — 12 3957 PWG

Oxycodone out of state, due to the Oxycodone crackdown in Kentucky. CS 2 advised that he was being seen at TOTAL MEDICAL CARE in Florida, (Note: this pain clinic is owned by Gerald WISEBERG). CS 2further stated that the Florida clinic was having problems, so he came to the Baltimore clinic to get his medication. He could not provide the name of the doctor or medical practice that he just visited.

17.      CS 5 stated that he was the father of CS 2 and he assisted his son by taking him to his various doctor's appointments. CS 5 stated that his son had a pain problem and was not able to get the amount of pain medication in Kentucky that he required, so they would travel out of state to obtain the medication. They first went to a clinic in Florida called TOTAL MEDICAL CARE, but it was closed down by the authorities, so they were sent to their sister clinic in Baltimore, Maryland.

18.      During the month of September 2011, Detective Douglas Kriete of the Baltimore County Police Department was contacted by a medical doctor, who was later developed as Cooperating Source 6, in reference to his concerns regarding HEALTHY LIFE MEDICAL GROUP. CS 6 told Detective Kriete that he went to this clinic seeking employment. While at the location conducting an interview, CS 6 observed a number of people hanging outside the door of the clinic and inside he observed approximately 75-80 people waiting to be seen by the doctor. CS 6 met with Alina MARGULIS, who stated that she was the owner and operator of the clinic. MARGULIS told CS 6 that the clinic was a newly opened pain clinic. MARGULIS stated that they try to operate and follow the pain management guide lines as set forth by DEA on the internet, but she said that the office did not have any written protocols. MARGULIS told CS 6 that her office operated in the following fashion:

- All patients needed an MRI before they are seen.
- All patients who needed an MRI will have an appointment made for them by her staff at Open MRI of Washington.
- All patients are charged $300.00 to $350.00 per visit and they did not accept insurance of any kind.

•     The patients had to submit to a urine or blood test upon request of the staff.

19.     At this point, MARGULIS gave the doctor a tour of the facility and CS 6 noted that the office had several very small examination rooms, which were furnished with a few basic pieces of medical equipment; two of the rooms were not furnished with equipment and one room was just drywall. MARGULIS stated that they tested urine in the office with test strips and CS 6 saw several vials of urine just sitting on various countertops. CS 6 asked MARGULIS about the salary and she told him that they would pay him $1,200.00 per day, which is $300,000.00 per year.

20.     MARGULIS told CS 6 that she owned a Nursing Home in New Jersey and was associated with a pain clinic in Florida called the "Total Care Medical Center" (TCM). TCM was owned and operated by Gerald WISEBERG, who also obtained the building lease for the HEALTHY LIFE MEDICAL GROUP. MARGULIS also stated that she owned several properties in New York.

21.     CS 6 ultimately decided to not take the job because he thought the business was a "pill mill", or a place that was not designed to properly treat patients. Several factors led CS 6 to this conclusion, including: the types and amounts of patients seen each day by the office, the lack of written protocols, the fact that the business did not accept insurance, and only accepted cash, the appearance of the facility, the lack of medical equipment, and the lack of office equipment.

22.     During the month of October 2011, members of the BDO TDS interviewed a confidential source, hereafter referred to as CS 7, in regards to the HEALTHY LIFE MEDICAL GROUP. CS 7 advised the agents that he/she worked for this pain clinic for several months and CS 7 confirmed that the business was operated by three individuals, Alina MARGULIS, Michael REZNIKOV and Gerald WISEBERG. CS 7 stated that WISEBERG owned and operated a pain clinic in Florida, while MARGULIS and REZNIKOV operated the pain clinic in Reisterstown, Maryland. WISEBERG, MARGULIS, and REZNIKOV are not medical doctors.

23.     CS 7 stated that he/she began employment with the center in Reisterstown during 2011. During the time he/she was working at that location, he/she observed that patients were being written prescriptions for large amounts of Oxycodone and Xanax, which in combination is highly addictive. CS 7 was told on several occasions by MARGULIS and WISEBERG that he/she had to write the scripts for what the patients wanted, in terms of type and amounts of medication. On one occasion, WISEBERG instructed CS 7 to give the patients prescriptions for 120 count 30mg Oxycodone and 60 count 15mg Oxycodone for "break through pain"; this medication was given on top of the Xanax or Alprazolam.

24.     CS 7 observed on many occasions that the patients came in with complaints of severe back or neck pain, but they moved about without restriction or any signs of pain or stiffness. During the time that CS 7 worked at HEALTHY LIFE MEDICAL GROUP, CS 7 noted that the readings/diagnosis of the MRI reports were not accurate and some of them were outright false. When CS 7 confronted the doctors, MARGULIS, or WISEBERG about the inconsistences, they would just brush it off as an anomaly and told him/her to go about their business.

25.     CS 7 stated that he/she started to notice that there were a lot of out of state patients, such as West Virginia, Kentucky, Ohio, Virginia, and Florida. When CS 7 confronted a patient from Florida about driving all the way to Maryland when there were pain clinics in Florida, the patient said that the Florida office was shut down and that WISEBERG told all of his patients to come to his Maryland office. After hearing this news, CS 7 went to MARGULIS and asked her if it was true, at which time, MARGULIS denied that the Florida office had been shut down.

26.     During the early part of the summer of 2011, CS 7 resigned from HEALTHY LIFE MEDICAL GROUP. CS 7 was not comfortable with the practice at Healthy Life for several reasons, including: that the business did not accept insurance, and only accepted cash, the large quantity of out of state patients, a push by MARGULIS and WEISBERG to write more and larger amounts of Oxycodone and Xanax, the feeling that he was being forced to write prescriptions for patients who complained of injuries that did not exist, having to deal with false or fictitious MRI reports, and the feeling that he believed HEALTHY LIFE MEDICAL GROUP

was making large profits off of the addiction of its patients.

27.   During the month of December 2011, agents interviewed a Confidential Source, hereafter referred to as CS 8, in reference to the HEALTHY LIFE MEDICAL GROUP. CS 8 stated that he/she worked at the Open MRI of Washington (Washington MRI) and was in a position to see and review various radiology materials ordered by the medical staff at HEALTHY LIFE MEDICAL GROUP. CS 8 stated that Michael REZNIKOV met with personnel from Washington MRI and requested that they only perform a two sequence MRI, which takes less than half the time required to complete a full MRI scan and only provides a limited amount of diagnostic radiological information. A full scan takes approximately 30 to 40 minutes to complete and requires a 4 sequence scan. CS 8 stated that the owner/operators of HEALTHY LIFE MEDICAL GROUP did not care that the scans were of low quality and were not a good diagnostic tool for identifying the source of the patient's chronic pain, the only thing they wanted was a paper trail so they could show any investigative organization that their patients received an MRI prior to going on a regiment of opioid medications.

28.   CS 8 was told by MARGULIS and REZNIKOV that they were interested in giving the patients what they paid for within reason. CS 8 stated that MARGULIS and REZNIKOV hired Dr. William CRITTENDEN to be the first medical director for the HEALTHY LIFE MEDICAL GROUP. CS 8 advised that he/she was contacted by Dr. William Crittenden and told that he left HEALTHY LIFE MEDICAL GROUP on August 12, 2011, but he was still being contacted by various pharmacies asking him to verify opioid prescriptions that were being written under his name from the HEALTHY LIFE MEDICAL GROUP. CS 8 stated to investigators that, at the time of the interview, Washington MRI were still receiving MRI request from HEALTHY LIFE MEDICAL GROUP, but these requests were still being issued under Dr. Crittenden's name by the medical staff at HEALTHY LIFE MEDICAL GROUP. Dr. Crittenden told CS 8 that during the four (4) months he worked at HEALTHY LIFE MEDICAL GROUP, the clinic made in excess of $1,000,000 dollars. Crittenden admitted to CS 8 that he often wrote opioid medication for patients that had no medical reason for obtaining the drugs, but he had to keep the customers happy. Often the patients would complain when they received non-opioid pain killers, because

Page 12 of 20

12 3947 PWG 12 3957 PWG

the patient wanted Oxycodone.

29.   · CS 8 was introduced to Gerald WISEBERG, who was partners with MARGULIS and REZNIKOV. WISEBERG was responsible for obtaining the office space for the organization and setting up the practice. WISEBERG told CS 8 that he was given the "formula" for establishing "pain clinics" and he felt that if the organization stuck with the plan, they would not be detected by authorities. If they were identified as a "pill mill" they would produce a paper trail that would give them the appearance of being a legitimate pain clinic. This formula consisted of patients having an MRI completed before any prescriptions are written, no matter what the result of the MRI. The second part was that all patients would submit to a urine test at each visit. It did not matter if the patient passed or failed the test, only that a test was given. All of the urine tests are conducted in-house and are not analyzed by a laboratory, so there are no records of the results and the patients charts only show what the medical staff placed in them. The last part consisted of obtaining a valid form of Identification and a drug history from the patient's pharmacy.

30.    On April 23, 2012, Detective Kriete met with a confidential source (CS 9) in reference to the HEALTHY LIFE MEDICAL GROUP pain clinic. CS 9 stated that he/she has been seen twice by the medical staff at the clinic, and said the clinic was nothing more than a "Pill Mill". The CS advised that the majority of the patients were from out of state, young, and without observable injuries or illnesses. The CS was asked to produce $300 in cash for his/her visit and the following materials: a recent MRI (within the past 2 years), a pharmacy patient profile, a complete printout from his/her family doctor, and a signed patient information package with a form inquiring if you are a member of the the a law enforcement agency, which asks what position you hold within that agency and state the reason for you visit at the clinic.

31.    CS9 gave a statement to the detectives, in which she advised that he/she received the prescriptions based on his/her verbal complaint; at no time during his/her visit with the doctor at HLGM received a hands-on physical exam. Additionally, CS9 stated that the doctor conducted only a limited flexibility exam.

r 12 3947 PWG-12 3957 PWG

32.     At the end of the first office visit, CS 9 left the clinic and was returning to her vehicle when the security guard for the HEALTHY LIFE MEDICAL GROUP approached him/her and asked if he could purchase CS 9's prescriptions. CS 9 told the security guard, "No" and left the area. During the second office visit, CS 9 learned from talking with other patients in the waiting room that a lot of the patients were previously seen at the clinic in Florida (Total Medical Care pain clinic, owned by Gerald WIESBERG), which had been shut down by the authorities. The owner of the Florida clinic opened this clinic in Maryland and instructed the Florida patients to come here to get their prescriptions.   CS 9 was also told by other patients that the local pharmacies have "blacklisted" HEALTHY LIFE MEDICAL GROUP and they will not fill their prescriptions.

33.     From July 2011 to March 2012, The DEA Baltimore District Office initiated an undercover operation utilizing four undercover agents, who were posing as wood-be patients and were seen by various staff physicians at the HEALTHY LIFE MEDICAL GROUP Pain Clinic. The undercover agents were provided with large quantities of narcotics without a legitimate medical need. Collectively, the undercover agents visited HEALTHY LIFE MEDICAL GROUP approximately eight (8) times over the operational period.

34.     The following is an example of the type and nature of a supposed medical visit at the HEALTHY LIFE MEDICAL GROUP clinic. During the month of June 2011, the DEA Baltimore District Office sent an undercover agent to pose as a potential patient and sent him/her into the HEALTHY LIFE MEDICAL GROUP for the purposes of seeing a doctor. Once at the clinic, the UC was charged $300.00 when he/she attempted to register for an appointment. Then he/she was told that he/she would need an MRI before the UC could see the doctor. The UC noted that there were approximately 30-40 patients in the waiting area and outside the office door.

35.     The staff at HEALTHY LIFE told the UC that they would make an appointment with Washington Open MRI for him/her. They told the UC to drive to the MRI clinic and obtain

his/her MRI. The UC did obtain an MRI, and was provided with a report for the pain clinic.

36.    When the UC went back to the clinic, he/she provided the clinic with the MRI report. The UC then met with a medical assistant who administered a urine test in her presence. When they called the UC back to see the doctor, the UC met with Dr. William CRITTENDEN. Dr. CRITTENDEN reviewed the UC's MRI and told the UC that his/her neck was seriously damaged, and in the doctor's opinion, the UC may require surgery. The doctor asked the UC how much pain was he/she in using the scale from 1 to 10. The UC stated that it was a "2". The doctor responded, "It must be more like 4 or 6, right?" The UC started to agree with him, but the doctor had already made his notes on the chart. The UC said that the doctor led him/her throughout the documentation of his/her supposed condition. At no time did the doctor touch or do any type of physical exam of the UC. Once the information was completed, the UC was asked to go out to the lobby and wait for his/her prescriptions.

37.    The UC waited about an hour when MARGULIS called the UC to the counter and started to question him/her regarding the UC's driver's license information. MARGULIS believed that there was something wrong with the UC license, but the UC talked her out of her suspicions and she ended up giving the UC his/her prescriptions for the following drugs:

- Oxycodone 30mg, 168 pill count
- Alprazolam 2mg, 28 pill count
- Parafon Forte 500mg, 56 pill count

38.    During the month of July 2011, the UC attended his/her second appointment at the Healthy Life Pain Clinic. During this visit, the UC met with Dr. CRITTENDEN and was prescribed the following:

- Oxycodone 30mg, 112 count
- Oxycodone 15mg, 56 count
- Alprazolam 2mg, 28 count
- Parafon Forte 500mg, 56 count

T 12 3947 PWG -12 3957 PWG

39. Once the UC left the clinic, he/she noticed that the scripts were different than what he had previously received, so the UC went back to the clinic. Once inside the clinic, the UC told the clerk that his/her prescriptions were not correct. The clerk retrieved MARGULIS, who intervened and asked the UC what was the problem. The UC told MARGULIS that the scripts were wrong and she replied that they were correct. The UC started to argue with her when Michael REZNIKOV approached the UC and again asked what was wrong. The UC told both of them that he/she wanted to see the doctor. REZNIKOV escorted the UC into the back receptionist area of the office. The UC told the doctor that the scripts were wrong and the doctor stated that the UC was wrong and the scripts were correct. The UC referred the doctor and REZNIKOV to a medication history form from a pharmacy that was in the UC's patient file, which showed that the UC was given 168 30mg Oxycodone during his last visit.

40. Dr. CRITTENDEN then stated that the UC should not have received that much 30mg Oxycodone during the last visit; because that was the maximum amount of Oxycodone he can write for in a 30 day period. The UC stated that he/she wanted this situation fixed. Dr. CRITTENDEN wrote the UC the following prescriptions and the UC departed the clinic:

- Oxycodone 30mg, 168 pill count
- Alprazolam 2mg, 28 pill count
- Parafon Forte 500mg, 56 pill count
- Neurontin 600mg, 56 pill count
- Mobic 15mg, 28 pill count

41. During the same month, TFO Lemuel Aulton was contacted by Detective Katelyn Wojtowycz from the Anne Arundel County Police Department regarding Dr. William CRITTENDEN. Det. Wojtowycz said that she was contacted by a local Rite Aid Pharmacist in regards to several suspicious prescriptions written for out of state patients by Dr. CRITTENDEN from the HEALTHY LIFE MEDICAL GROUP. All of the out-of-state patients presented scripts for the same drug, strength and amount; 30mg Oxycodone tablets with a 168 pill count. The Pharmacist advised that this was not the first time this situation has occurred with Dr. CRITTENDEN or the HEALTHY LIFE MEDICAL GROUP, but he felt it was time that he did

**12 3947 PWG—12 3957 PWG**

something about it, so that is why he called the police. It is known to the TDS Unit that many pharmacies in the area will not accept prescriptions from Dr. CRITTENDEN or the HEALTHY LIFE MEDICAL GROUP, because of their illicit activities.

42.     On or about November 26, 2011, the owners of the HEALTHY LIFE MEDICAL GROUP clinic moved their business from Reisterstown Road to 1134 York Road, Lutherville, Maryland. Once they established the new location for their clinic and re-opened, investigators discovered that REZNIKOV and MARGULIS had brought on another member of their organization down to assist in running the clinic at its new location. That person was identified as Kahi BLIADZE, who resides in Brighton Beach, Brooklyn, New York. During surveillance of the HEALTHY LIFE clinic, agents have seen Michael REZNIKOV, Alina MARGULIS, and Kahi BLIADZE driving to local banks. For instance, surveillance followed REZNIKOV from the clinic to the M&T Bank, located in Baltimore County, where the individuals entered the bank carrying what appeared to be U.S. Currency and other pieces of paper. When REZNIKOV exited the bank, he was empty handed. It is believed that REZNIKOV entered the M&T Bank to make a cash deposit from his business at Healthy Life. Grand Jury Subpoenas for M&T Bank have revealed that REZNIKOV, and other members of the organization, have made cash deposits with the banking establishment in the name of Healthy Life.

43.     During the month of January 30, 2012, the DEA Baltimore District Office installed a clandestine camera outside the HEALTHY LIFE MEDICAL GROUP building, located at 1134 York Road. The camera overlooks the front door of the clinic and two sides of the building. Surveillance was conducted from this camera and a patient count was obtained for the purposes of identifying how many patients are being seen at this clinic. Over a two month period, April and May 2012, SA Stine viewed 25 days of footage from the camera and he observed that the clinic was seeing approximately 142 people per day. If this number was reduced by 15% for redundancy and non-patient entries, the clinic would be seeing 120 patients per day.

44.     On May 5, 2012, The Easton Police Department received a complaint from the Walgreen's Pharmacy, located at 8174 Ocean Gateway, Easton, Maryland 21601, regarding out of state subjects trying to pass HEALTHY LIFE MEDICAL GROUP prescriptions. The

r  12 3947 PWG -12 3957 PWG

Pharmacist told the responding police officer that three individuals arrived at their store and attempted to pass two prescriptions per person. The first two individuals attempted to pass prescriptions for 84 tablets of 30mg Oxycodone and 84 tablets of 15mg Oxycodone, which were written by Dr. Katherine A. Martin. The third subject, attempted to pass two scripts, one for 84 tablets of 30mg Oxycodone and the second for 56 tablets of 15mg oxycodone, which were written by Dr. Sohail Aman. All six prescriptions were written on May 5, 2012, at the HEALTHY LIFE MEDICAL GROUP in Baltimore, Maryland. The three subjects were interviewed by the Easton Police Department and gave statements that they did not have any legitimate medical reason for possessing the prescriptions in question. They stated that they went to HEALTHY LIFE MEDICAL GROUP pain clinic, where they paid $300 per person and received their prescriptions. They learned of the HEALTHY LIFE MEDICAL GROUP through other friends/people who were obtaining their oxycodone from this clinic.

## PREMISES TO SEARCH

45.     During the course of this Investigation, two Maryland addresses have been identified as being associated with various members of Healthy Life.  Healthy Life's medical office is located at 1134 York Road, Suite 101, Lutherville, Baltimore County, Maryland.   Agents have conducted surveillance at Healthy Life numerous times over the previous six months.   In addition, as described above, agents placed a pole camera outside the office for investigative purposes.

49.     The Investigation has also revealed that various members of the conspiracy often stay at the Hilton Hotel, located at 1726 Reisterstown Road, Pikesville, Maryland, during the work week. On multiple occasions, surveillance has followed Alina MARGUILS, Michael REZNIKOV and Kahi BLIADZE from the Healthy Life office to the Hilton Hotel. During the surveillances in question, the subjects were either driving a white Land Rover with Florida Registration or the brown Volkswagen Jetta listed below.

51.     On 5/2/2012, agents met with the Hilton Hotel manager, Bill Leonhardt, who provided

12 3947 PWG-12 3957 PWG

the agents with records that showed MARGULIS had rented a room on the following dates: 4/03/2012 thru 4/6/2012; 4/10/2012 thru 4/12/2012; 4/23/2012 thru 4/27/2012; 4/30/2012 thru 5/01/2012. Agents were also told that the subjects have stayed at the hotel in the past, but it is believed that they rented their rooms using other individual's identification, such as "I. MARGULIS". The rooms that they rent are intended for double occupancy and they usually stay in pairs, either MARGULIS and REZNIKOV or BLIADZE and REZNIKOV. Leonhardt also stated that MARGULIS and REZNIKOV frequently request to move from room to room during any extended stay. Leonhardt believes that this was done to increase their rewards points with the Hilton Club Card. They also indicated that MARGULIS is using a government identification card to obtain a government rate.

52.    Leonhardt indicated to the agents that if they were to conduct a search warrant at the hotel, the staff could and would provide the agents with the room number of the subjects on the day of the warrant, at the behest of the authorities. On 5/2/2012, agents/officers established surveillance at the Hilton Hotel and observed REZNIKOV and BLIADZE exit the Hilton Hotel, during the early morning hours, and enter the brown Volkswagen Jetta, REZNIKOV was carrying a briefcase. Surveillance followed the two subjects from the Hilton Hotel towards Healthy Life. Surveillance was re-established on the pole camera, where the vehicle arrived at the HLMG clinic and the subjects went inside same. On 5/15/2012, agents were advised by the manager of the Hilton Hotel that Ilina MARGULIS, spouse of REZNIKOV, was renting room 327 along with REZNIKOV and BLIAIDZE

53.    2012, Volkswagen Jetta, New York Registration FSD5006,
VIN#: 3VW2K7AJ3CM305526, 4 door, brown in color, registered to Regina CHERDAK, 1120 Brighten Beach Avenue, Apartment 5E, Brooklyn, New York, identified as the girlfriend of Kahi BLIADZE. This vehicle has been observed on several surveillances being operated by REZNIKOV and BLIADZE. The vehicle has been followed from HLMG to the M&T Bank and from HLMG to the Hilton Hotel and back to the clinic. This vehicle has been utilized to transport documents and U.S. Currency by the members of the MARGULIS DTO. This vehicle was also observed traveling from the HLMG clinic to New York (Brooklyn) and back. It is believed that

T 12 3947 PWG — 12 3957 PWG

the members of the MARGULIS DTO utilized this particular vehicle for use in their day to day operations at the HLMG.

## CONCLUSION

54.     Based on the aforementioned factual information, we respectfully submit that there is probable cause to believe that Alina MARGULIS, Michael REZNIKOV, and Gerald WISEBERG, and any other owners, other doctors, and employees of HEALTHY LIFE MEDICAL GROUP, Inc. are involved in violations of federal law, including drug trafficking and related activities in violation of Title 21, United States Code, Sections 841(a)(l) and 846. Additionally, there is probable cause to believe that evidence of the commission of these offenses is located in the PREMISES described above and that this evidence, listed in Attachment A and which is incorporated by reference, is evidence, contraband, the fruits of crime, things otherwise criminally possessed or property which is or has been used as a means of committing the foregoing offenses.

Brian M. Stine., SPECIAL AGENT
Drug Enforcement Administration


Detective Douglas Kriete
Baltimore County Police Narcotics-Diversion Unit

Subscribed and sworn to before me

this _____ day of _____, 2012.



UNITED STATES MAGISTRATE JUDGE
PAUL W. GRIMM